# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| [UNDER SEAL], | ) |
| | ) |
| **Plaintiffs,** | ) **FILED UNDER SEAL** |
| | ) **PURSUANT TO 31 U.S.C.** |
| **v.** | ) **§ 3730(b)(2)** |
| | ) |
| [UNDER SEAL], | ) |
| | ) **Civil Action No.** _____ |
| **Defendants.** | ) |
| | ) **Jury Demand** |
| | ) |
| | ) |

---

## FALSE CLAIMS ACT COMPLAINT

---

### DOCUMENT TO BE KEPT UNDER SEAL

### DO NOT PLACE ON PACER

BARRETT JOHNSTON MARTIN & GARRISON, LLC
Jerry E. Martin
Seth Hyatt
Bank of America Plaza,
414 Union St., Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

CONSTANTINE CANNON LLP
Timothy McCormack
Sarah P. Alexander
1001 Pennsylvania Ave., N.W.,
Suite 1300 N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501
tmccormack@constantinecannon.com
spalexander@constantinecannon.com

Attorneys for [under seal]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| **UNITED STATES OF AMERICA, THE STATE OF NEW MEXICO, THE STATE OF OKLAHOMA ex rel. WILMECIA ROBINSON,** ) ) ) ) ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **Civil Action No. _____** |
| **AHS MEDICAL HOLDINGS LLC d/b/a ARDENT HEALTH SERVICES, ARDENT HEALTH PARTNERS, LLC d/b/a ARDENT HEALTH SERVICES, and ARDENT MEDICAL SERVICES, INC. d/b/a ARDENT HEALTH SERVICES,** ) ) ) ) ) ) | **Jury Demand** |
| **Defendants.** | |

---

## FALSE CLAIMS ACT COMPLAINT

---

1.      Plaintiff-Relator Wilmecia Robinson, through her attorneys, on behalf of the United States of America (the "Federal Government") and the States of New Mexico and Oklahoma (collectively, the "Plaintiff States," and with the Federal Government, the "Government"), states as follows:

## I.      INTRODUCTION

2.      This is an action to recover damages and civil penalties on behalf of the United States of America and the Plaintiff States arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants AHS Medical Holdings LLC d/b/a Ardent Health Services, Ardent Health Partners, LLC d/b/a Ardent Health Services, and Ardent Medical Services, Inc. d/b/a Ardent Health Services (collectively "Ardent" or "Defendants"), in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*., the New

Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*, the New Mexico Fraud

Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*, and the Oklahoma Medicaid False

Claims Act, Okla. Stat. tit. 63, § 5053.1 *et seq.*

      3.      This *qui tam* case is brought against Defendants for knowingly defrauding the

Government by, *inter alia*:

         a.   submitting false information on its claims for reimbursement both to get

              invalid claims paid and to improperly increase the amount paid by

              government-funded healthcare programs;

         b.   failing to investigate and repay suspected and known overpayments from

              government-funded healthcare programs; and

         c.   falsifying informed consent documentation to fraudulently seek payment for

              sterilization procedures.

      4.      This fraud was not incidental.  Instead, Ardent deliberately "tested" ways that it

could successfully defraud the Government, and then programmed its computer systems to apply

the same fraudulent misrepresentations when similar claims were submitted subsequently.

Ardent also altered its contractual models to hide overpayments.

      5.      As a result of these actions, Defendants have submitted and caused to be

submitted tens, if not hundreds, of thousands of fraudulent claims to federal- and state-funded

healthcare programs for healthcare services that were not performed as billed.  Each submission

is a false or fraudulent claim in violation of the federal and state false claims acts.  Defendants

have purposefully refused to repay the same healthcare programs for known overbilling.  Each

invalid retention of ill-gotten gains is also a false or fraudulent claim in violation of the federal

and state false claims acts.

6.     Defendants' frauds described herein have been occurring from at least February 2009, when Plaintiff-Relator Robinson began working at Ardent. These frauds are ongoing. The relevant time period is thus February 2009 through the present.

7.     Defendants' conduct alleged herein violates the federal False Claims Act as well as the Plaintiff State false claims acts. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986 (and in 2009 and 2010) to enhance the ability of the federal government to recover losses sustained as a result of fraud against it. Congress intended that the 1986 amendments would turn the FCA into the primary tool for combating pervasive fraud in federal programs. The amendments created incentives for individuals with knowledge of fraud against the Government to disclose this information without fear of reprisals or Government inaction, and for the private bar to commit legal resources to prosecute fraud on the Government's behalf.

8.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§ 3729(a)(1)(A)-(B), and (G). Any person who violates the FCA is liable for a civil penalty of up to $21,563 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

9.     The FCA allows any person with information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

10.     Like the federal FCA, the state false claims acts also prohibit a party from knowingly presenting a false or fraudulent claim for payment or approval, knowingly making or using a false or fraudulent record or statement material to a false or fraudulent claim, knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state government, and knowingly concealing an obligation to pay or transmit money or property to the state government.  *See* N.M. Stat. Ann. § 44-9-1 *et seq*.  In addition, some states, including New Mexico and Oklahoma, have Medicaid-specific false claims acts that prohibit false or fraudulent conduct against the state Medicaid programs.  *See* N.M. Stat. Ann. § 27-14-1 *et seq.*; Okla. Stat. tit. 63, § 5053.1 *et seq.*

11.     Based on the foregoing laws, *qui tam* plaintiff Wilmecia Robinson seeks, by and through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims made by Ardent to the Federal Government and the Plaintiff States.

## II.     PARTIES

12.     Plaintiff-Relator Wilmecia Robinson ("Plaintiff-Relator" or "Ms. Robinson") is a billing specialist residing in Madison, Tennessee.  She began working for Defendants on or around February 9, 2009, as an "Underpayment Recovery Specialist."  In 2013, she was promoted to "Lead Government Underpayment Recovery Specialist."  Her responsibilities include, *inter alia*, analyzing claims submitted to and payments made by government-funded

-4-

healthcare programs. At all times relevant to this complaint, Ms. Robinson worked for Defendants out of their Nashville, Tennessee, corporate headquarters.

13. Ms. Robinson began her career working for health-insurance companies, including spending a decade as a claims processor and Medicare quality auditor for Cigna. Although she is not, and has never been, a medical coder, she is well-versed in the rules of Medicare and Medicaid payments and in the process for submitting claims, reviewing claims, and processing claims.

14. Ms. Robinson has witnessed, and continues to witness, many of Defendants' fraudulent schemes firsthand. For example, Ms. Robinson's supervisors at Ardent repeatedly direct her to "test" different accounts to see if changing, adding, or removing procedure, provider, identity, or site of service codes will result in a higher reimbursement level for Ardent from government payers. Ms. Robinson and the other "underpayment specialists" were also tasked with analyzing and returning overpayments.

15. Defendant AHS Medical Holdings LLC d/b/a Ardent Health Services is a Delaware limited liability company with its principal place of business at 1 Burton Hills Blvd. Suite 250 Nashville, TN 37215.

16. Defendant Ardent Health Partners, LLC d/b/a Ardent Health Services is a Delaware limited liability company.

17. Defendant Ardent Medical Services, Inc. d/b/a Ardent Health Services is a Delaware corporation.

18. Defendants, through their parent, subsidiaries, and/or affiliates, own and operate a network of health systems under the name Ardent Health Services or Ardent. Ardent is one of the ten largest for-profit hospital operators in the United States, with approximately $2 billion in

annual revenue. In 2015, Ardent was purchased by investment companies Ventas Inc. and Equity Group Investments.

19.     The hospitals currently in Ardent's system include Lovelace Medical Center, Lovelace Women's Hospital, Lovelace Westside Hospital, Lovelace Rehabilitation Hospital, and Lovelace Medical Group in Albuquerque, New Mexico; Lovelace Regional Hospital Roswell in Roswell, New Mexico; Hillcrest Medical Center, Hillcrest Hospital South, Oklahoma Heart Institute, Tulsa Spine & Specialty Hospital, and Utica Park Clinic in Tulsa, Oklahoma; Bailey Medical Center in Owasso, Oklahoma; Hillcrest Hospital Claremore in Claremore, Oklahoma; Hillcrest Hospital Cushing in Cushing, Oklahoma; Hillcrest Hospital Henryetta in Henryetta, Oklahoma; and BSA Hospital, Physicians Surgical Hospitals, Harrington Cancer Center, and BSA Physicians in Amarillo, Texas.

20.     Ardent has announced a planned expansion to encompass an additional five hospitals, currently owned by the LHP Hospital Group. Those hospitals are Bay Medical Center Sacred Heart in Panama City, Florida; HackensackUMC Mountainside in Montclair, New Jersey; HackensackUMC at Pascack Valley in Westwood, New Jersey; Portneuf Medical Center in Pocatello, Idaho; and Seton Medical Center Harker Heights in Harker Heights, Texas.

## III.    JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a), as well as 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

22.     In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the state law claims asserted in this Complaint.

23.     Under 31 U.S.C. § 3730(e), and the analogous provisions of the relevant state false claims acts, there has been no statutorily relevant public disclosure of the "allegations or

transactions" in this Complaint.  Even if there had been any such public disclosure, Plaintiff-Relator Robinson is the original source of the allegations herein because she has direct, independent, and material knowledge of the information that forms the basis of this complaint, and voluntarily disclosed that information to the Government before filing.

24.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), whereby venue is proper in any jurisdiction "in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 [31 USCS § 3729] occurred."  That same section also authorizes nationwide service of process.

25.     Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), as well as 31 U.S.C. § 3732(a).  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this district and/or maintain employees and offices in this district.

## IV.     RELEVANT LAW

### A.     Federal- and State-Funded Healthcare Programs

26.     Various federal- and state-funded healthcare programs pay for care provided by Ardent.  During the times material to this action, Ardent derived a substantial portion of its revenue from Medicare, Medicaid, and other government-funded programs.

#### 1.     The Medicare Program

27.     Medicare is a federally funded health-insurance program that provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from end-stage renal disease.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

28.     The Medicare program has four parts.  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of hospital services and post-hospital nursing-facility care.

*See* 42 U.S.C. §§ 1395c, 1395d, 1395f, 1395g.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other healthcare providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic-testing facilities.  *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).  Medicare Part C covers certain managed-care plans, and Medicare Part D provides subsidized prescription-drug coverage for Medicare beneficiaries.

29.     The National Provider Identifier ("NPI") is a standard and unique health identifier for healthcare providers and is assigned by the National Plan and Provider Enumeration System.  As of May 23, 2008, all providers and practitioners were required to have an assigned NPI number prior to enrolling in Medicare and Medicaid.  A provider is required to use its NPI to identify itself on all standard transactions that it conducts where its healthcare provider identifier is required.  45 C.F.R. § 162.410(a).

30.     To administer the Medicare program, private insurance companies act as agents of the Department of Health and Human Services, making payments on behalf of the program beneficiaries and providing other administrative services.  42 U.S.C. §§ 1395h, 1395u.  These "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs") act as agents in reviewing and paying claims submitted by healthcare providers.  42 C.F.R. §§ 421.3, 421.100, 421.5(c).  Through these local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage.  This information is available to providers who seek reimbursement from Medicare.

31.     Since November 8, 2011, Novitas Solutions ("Novitas") has been the entity responsible for processing Medicare claims in states including Oklahoma, New Mexico, and Texas.  Novitas uses a system called Direct Data Entry ("DDE") for filing Medicare claims.

TrailBlazer Health Enterprises, LLC, was the entity responsible for processing Medicare claims in Oklahoma, New Mexico, and Texas from approximately August 2, 2007, to November 8, 2011.

32.     During the relevant time period, Defendants knowingly submitted and caused to be submitted claims to Medicare through Novitas's DDE system and TrailBlazer Health Enterprises's equivalent system.  At all times relevant to this action, the local carriers reviewed and approved the claims at issue based on the enrollment information and claim information provided by Defendants, and relied on the veracity of that information in determining whether and how much to pay the claims submitted by Defendants.

33.     The Social Security Act governs Medicare payments for all services.  Medicare covers services that it considers "reasonable and necessary."  Social Security Act § 1862(a)(1)(A); 42 U.S.C. § 1395y(a)(1)(A).  MACs may specify additional coverage requirements through Local Coverage Determinations ("LCDs").  CMS, Medicare Program Integrity Manual, Pub. No. 100-08, ch. 13, § 13.1.3.

34.     Medicare reimburses healthcare providers for the costs of providing covered health services to Medicare beneficiaries.  *See* 42 U.S.C. § 1395x(v)(1)(A).  To bill any government payer, including Medicare, institutional medical providers like Ardent must submit an electronic or hard-copy claim form called the UB-04 form, also known as the CMS 1450.  The form describes, among other things, the provider, the patient, the attending physician, the services provided by procedure code (including any applicable modifiers), the revenue codes, the related diagnosis code(s), the dates of service, the provider's NPI number, service facility location information, and the amount charged.

35.     Medicare reimburses providers differently based on the information submitted on the UB-04 claim form.  Medicare has established reimbursement rates based on the reported procedure codes (including any modifiers), revenue codes, and NPIs.

36.     The provider certifies on the UB-04 claim form that the information provided is "true, accurate and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

37.     In addition, to be eligible to receive payments from Medicare, each provider must sign an agreement wherein the provider agrees to comply with all Medicare requirements, including all fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

38.     Because it is not feasible for the Medicare program or its contractors to review the patient files for the millions of claims for payments it receives from providers, the Medicare program relies upon the providers to comply with the Medicare requirements and trusts providers to submit truthful and accurate claims.

39.     As a backstop, Medicare rules require providers to have, in each of their patients' files, the medical documentation demonstrating that the items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1395g(a).

## 2.     The Medicaid Program

40.     Medicaid is a public-assistance program that provides payment for medical expenses of low-income and disabled patients.  Funding for Medicaid is shared between the Federal Government and states that participate in the program.

41.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for

-10-

medical assistance" that is consistent with Title XIX of the Social Security Act and the regulations of the Secretary of Health and Human Services. Although Medicaid is administered at the state level, state programs must adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the Federal Government will pay through its funding of state Medicaid programs.

42. Medicaid in New Mexico is administered by the Human Services Department. Medicaid in Oklahoma is administered by the Oklahoma Health Care Authority ("OHCA"). Medicaid in Texas is administered by Texas Health and Human Services.

43. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state. For example, OHCA requires any prospective Medicaid provider to sign an approved Provider Agreement that certifies, *inter alia*, that "all information submitted on claims is accurate and complete." Okla. Admin. Code § 317-30-3-2.

44. As is the case for Medicare claims, Ardent submits all Medicaid claims to the respective state authorities via UB-04 claim forms. Thus, all of the same certifications regarding truthfulness and medical necessity apply to Ardent's Medicaid claims.

45. Also like Medicare, Medicaid pays providers based on the information submitted on UB-04 claim forms. Medicaid reimburses providers different amounts depending on what information is submitted to the program.

### 3. Other Government-Funded Healthcare Programs

46. The Federal Government administers other healthcare programs including, but not limited to, TRICARE (formerly known as the Civilian Health and Medical Program of the Uniformed Services, or CHAMPUS); the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"); the Federal Employee Health Benefit ("FEHB") Program; and the Crime Victims Compensation Fund of the Department of Justice.

-11-

47.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1071 *et seq.*; 32 C.F.R. § 199.4(a).

48.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100 percent service-connected disabilities.  38 U.S.C. § 1781 *et seq.*; 38 C.F.R. § 17.270(a).

49.     The FEHB Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and their survivors.  5 U.S.C. § 8901 *et seq.*; 5 C.F.R. § 890.101 *et seq.*

50.     The Crime Victims Fund, administered by the Office for Victims of Crime within the Department of Justice, provides funds for certain "medical expenses attributable to a physical injury resulting from compensable crime."  42 U.S.C. §§ 10602, 10605.

51.     To the extent that the Plaintiff States provide healthcare benefits to certain individuals, based on the person's financial need, employment status, or other factors, and those programs are covered by the Plaintiff States' false claims acts, those programs are referred to in this Complaint as "state-funded" or "government-funded" healthcare programs.

**B.     General Rules for Billing Government Healthcare Programs**

52.     Government-funded healthcare programs, like most non-government programs, generally use different payment systems and methodologies based on where the services are provided, *e.g.*, hospital inpatient services, hospital outpatient services, or services performed in a physician office.

53.     In general, hospitals are paid for services they perform in an inpatient setting on a "per case" basis.  Under this system, each hospital stay is classified as falling into a Diagnosis Related Group ("DRG"), based on the type of services the patient received, their primary

medical condition, and the number and severity of any complications or other medical problems (also called comorbidities) the patient had. Hospitals are generally paid a fixed amount to cover all services the patient received during their stay, based on the DRG classification of the case. Although there are some limited exceptions, as a general rule hospitals are paid only the DRG-based per-case payment for all services performed—individual services are generally not reimbursed separately.

54.     In the hospital outpatient setting, payments to hospitals are based on a different bundled, per-case payment system, the Ambulatory Payment Classification ("APC") system. Similar to the DRG-based payment system for inpatient services, Medicare reimburses hospitals for outpatient services through standardized payments determined by the APC to which the claim is assigned.

55.     Each claim is assigned one or more APCs based on the procedure codes (*i.e.*, HCPCS codes, as described below) included on the claim form. Unlike inpatient DRG payments, where the hospital generally receives only one DRG payment per case, hospitals can receive multiple APC payments for the same outpatient case, depending on the nature of the services provided.

56.     Physician services provided to either inpatients or outpatients are billed and reimbursed separately from the hospital's DRG- or APC-based payment. Physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS"). In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them. Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

-13-

57.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS"). HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid, and other healthcare programs pay for services rendered to patients by healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care. To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, these federal- and state-funded programs tie levels of reimbursement to these standardized codes.

58.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (also called Level I codes) and are published and updated annually by the American Medical Association. Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Anesthesiology," "Surgery," "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians and other healthcare professionals working in that field.

59.     The instructions that accompany the CPT manual direct providers "not [to] select a CPT code that merely approximates the service provided." Rather, if no accurate service procedure or service exists among the standard CPT codes, providers are instructed to "report the service using the appropriate unlisted procedure or service code" (i.e., the special CPT codes provided for use when none of the standard CPT codes reasonably and adequately describes the specific procedure or service provided).

60.     Codes listed after each subsection in the CPT Manual and ending in -99 are "unlisted" codes.

-14-

61.     Correct code assignment occurs after the documentation for the claim is reviewed by the carrier.

## C.     Providers Have a Duty to Submit Truthful Bills and to Correct Known Errors and Falsehoods in Prior Bills

62.     Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320a-7b(a)(1).

63.     Similarly, federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other federal healthcare programs to disclose those omissions or errors to the Government.  *See* 42 U.S.C. § 1320-a-7b(a)(3).

64.     The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other federally funded healthcare programs.  *See, e.g.*, 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

65.     Providers have a further obligation to verify that the amount they have been reimbursed by the Government is accurate.  If Medicare or Medicaid overpays providers for the service provided, providers must return the overpayment.  An overpayment includes "any funds that a person receives or retains under Title XVIII [Medicare] or XIX [Medicaid] to which the person, after applicable reconciliation, is not entitled."  42 U.S.C. § 1320a–7k(d)(4)(B).  Such overpayments must be reported and returned" within "60 days after the date on which the overpayment was identified."  *Id.* § 1320a–7k(d)(2).

66.     Providers must exercise reasonable diligence, including a timely, good faith investigation of credible information, to discover overpayments and then return them in a timely fashion.

-15-

67.     There is no minimum monetary threshold for overpayments that need to be returned.  In adopting the final implementing rules on overpayments, CMS specifically refused to adopt a "de minimis" standard.  *See* Medicare Program; Reporting and Returning of Overpayments, 81 Fed. Reg. 7654, 7677 (Feb. 12, 2016).

68.     For purposes of the False Claims Act, failure to return an overpayment is an "obligation."  42 U.S.C. § 1320a-7k(d)(3).

## V.     ALLEGATIONS

69.     In her roles as Lead Government Underpayment Recovery Specialist and Underpayment Recovery Specialist, Relator Wilmecia Robinson discovered multiple schemes by Defendants to defraud Medicare, Medicaid, and other government healthcare programs.

70.     Ardent systematically explored and probed the electronic claims-payment systems used by government-funded healthcare programs to identify ways to fraudulently upcode its claims submissions.  These strategies included changing information about the location where services were provided, the type of services provided, the patient's diagnosis, and other key information about the patient or the care delivered.

71.     Relatedly, when Ardent learned, or had reason to suspect, that it had been overpaid by the government for previously submitted claims, Ardent did not investigate and refund the overpayments.  Instead, Ardent either manipulated the patients' records to suggest the overpayments were appropriate or, in many cases, simply ignored the problem and overrode its systems to falsely claim that no overpayment existed or that repayment had been attempted but rejected by the government.

72.     Beyond issues with fraudulent billing and coding, Relator also witnessed fraudulent conduct including, *inter alia*: (a) falsifying patient consent forms to fraudulently get

claims for sterilization procedures paid and (b) fraudulently treating rejected and denied claims as billable claims to the government.

A.    **Ardent's Fraudulent Upcoding Scheme**

73.    The amount that Medicare, Medicaid, and other government-funded healthcare programs pay hospitals (and also, often, whether the claim will be paid at all) is based on key information included on the claims forms the hospitals submit. Accordingly, when hospitals purposefully submit false codes on their claims forms, they are making a false statement to the government regarding the treatment provided.

74.    As set forth in greater detail below, Ardent has engaged and continues to engage in a deliberate scheme to submit false information on its claims to the government to get paid more than the amount to which it was entitled. Examples of the types of information that Ardent fraudulently manipulates as part of this scheme include information about: (1) the location where services were provided; (b) the type of service performed and the patient's diagnosis or other medical conditions; (c) the age of the patient; and (d) other information about the nature of the services provided.

1.    **The Scheme**

75.    Ardent's scheme to defraud is deliberate, ongoing, and the result of methodological testing of what revenue, procedure, diagnosis, and other codes will allow Ardent to get paid the most. Ms. Robinson's manager, Denise Buster, has repeatedly ordered Ms. Robinson and her colleagues to perform "tests," by changing the information submitted to the government on claims forms to discover which combination of information (regardless of the truth of the information) will get the highest reimbursement. The testing process involved changing codes on a UB-04 then submitting the changed forms to Medicaid or Medicare and reporting back to Ms. Buster which changes "paid."

-17-

76.     For example, in April 2014, Ms. Buster emailed Ms. Robinson about a set of claims for breast-imaging procedures.  The claims had been previously submitted to Oklahoma's Medicaid program, but were denied because Ardent had failed to get proper authorization before performing the procedure.  Okla. Admin. Code § 317:30-3-57 (requiring prior authorizations for most outpatient diagnostic x-rays and lab services, including the breast-imaging procedures in question).

77.     In her email, Ms. Buster told Ms. Robinson to "try[] changing the revenue code to 490 instead of 360 and let me know what happens."  When a claim is submitted using revenue code 360, that indicates the service was provided in an operating room.  Revenue code 490, on the other hand, indicates that a service was provided in an Ambulatory Surgery Center ("ASC").

78.     Ms. Robinson did as Ms. Buster instructed, and Oklahoma's Medicaid program paid the claims.

79.     In fact, these services had been performed in an operating room, so revenue 360 was the proper code.  None of Ardent's hospitals in Oklahoma, including its flagship location Hillcrest Medical Center ("HMC"), even have an ASC, which is what revenue code 490 represents.  Billing services to a phantom ASC is both factually and legally wrong.  But 490 was the code that paid, so 490 was the code Defendants used.

80.     Once Ardent figures out through this "testing" how to fraudulently alter their government claims, it programs its computer system to automate the fraud.  Jadene Elden, the Director of the Central Business Office at Hillcrest Medical Center, is responsible for these programmatic changes, which Ardent sometimes referred to as "SSI Programming" or a "change control plan."

-18-

81.     The scheme works as follows.  Ardent's billing department first submits correct bills to Medicaid and Medicare.  If those bills come back "underpaid"—that is, reimbursing less than Ardent's contracting model believes they should—a computer system automatically changes the codes on the bills to increase its reimbursement.  Ardent then resubmits these "underpaid" bills to Medicare and Medicaid with the updated, falsified coding for an inflated reimbursement.

82.     Ardent uses both their "Star" system, the internal system for keeping billing notes and other details about the claim, and the "SSI" system, Ardent's electronic billing system, to make these automatic changes.  Ardent also creates a document outlining each change, known as a "change control" document.

83.     Although Ms. Elden's office is at HMC, Ardent applies these changes systemwide to their hospitals in New Mexico and Texas, as well as the other Oklahoma facilities.  The "change control" decisions made for HMC are effectively made for all Ardent facilities.

84.     This automated process means that, once Ardent figures out how to fraudulently upcode a particular type of claim, no one from the Payment Variances department needs to spend any time manually changing the bills.  By automating this process, Ardent not only is able to expand the scope of its fraud, it can do so in a cost-efficient manner.

85.     Ms. Buster has used her personal friendship with Kelly Taylor, an employee at Oklahoma Health Care Authority ("OHCA"), to further this scheme.  Ms. Taylor gives Ms. Buster "off the record" advice about which codes could be used to get denied claims paid, and to get higher reimbursement for other claims.

86.     In a November 28, 2011 email discussing a scheme to upcode claims for intravenous therapy, Ms. Buster wrote:  "In discussing this with Medicaid [Ms. Taylor] their

-19-

advice was to bill with revenue code 269. We tested this and we were paid for the additional units under the fee schedule and not the flat rate." In the same email, Ms. Buster wrote that "I realize this is not the normal for charge capture but what should we do when a payor has an edit that does not work with standard charge practices?"

87. Ms. Buster knew that Ms. Taylor was not providing this information as an official Medicaid representative but rather in an inappropriate manner. For example, Ms. Buster informed Ms. Robinson via email on April 5, 2013, that "when [Kelly] and I are discussing an issue let's not involve other people because they escalated to the nurse reviewer and Kelly was told that she needed to not be discussing these items. We do not want to lose her as a resource."

### 2. Misrepresenting Where the Services Were Provided

88. Two of the key pieces of information on a standard hospital claim that indicate where a service was provided are the revenue code and the National Provider Identification number. As part of its fraudulent scheme, Ardent routinely falsifies this information in its claim submissions.

89. In billing government payers such as Medicare or Medicaid, providers such as Ardent use revenue codes to indicate the site of service (where in a hospital a particular procedure was performed). These codes effectively correspond to hospital departments. The Government reimburses providers different amounts for each procedure based on the site of service. This reflects the reality that hospital costs of nursing, equipment, etc. are higher in some settings than others. For example, revenue code 360 means that a procedure was performed in an operating room; revenue code 450 means that the procedure was performed in an emergency room; and revenue code 490 means that the procedure was performed in an ASC.

90.     Revenue codes can also indicate the type of service provided in a particular setting.  For example, revenue code 120 means that a medical patient was in a semi-private room, while revenue code 124 denotes a psychiatric patient in a semi-private room.

91.     Finally, there are "general" revenue codes and specific revenue codes within a particular setting.  For example, revenue code 410 means general respiratory services whereas revenue code 412 means inhalation services.

92.     Hospitals must use the "appropriate" and "specific" revenue code when submitting the UB-04 claim form.  Medicare Claims Processing Manual, ch. 25, § 75.4.  It is not proper to bill for "general" services if the more specific code is correct.

93.     Ardent systematically manipulates revenue codes to fraudulently claim a higher reimbursement from Medicare and Medicaid than that to which it is entitled and would be paid if it had submitted truthful information to the government.

94.     For example, as discussed above, if claims submitted using revenue code 360 (indicating the procedure was performed in an operating room) are denied, Ardent routinely changes the revenue code to 490 (indicating that the procedure was performed in an ASC).  This is done for a wide range of services, not just for the breast imaging services discussed above.

95.     In an April 2014 email chain, Ms. Buster told Ms. Robinson to "test the 490" for certain breast biopsy claims, stating "I thought all for the breast biopsy claims for Medicaid we updated to 490 so they would hit the Title XIX rate because the APC [ambulatory payment classification] table has these code as $0."  Again, by falsely claiming the services were performed in an ASC setting, Ardent caused Medicaid to pay for services that would have otherwise been denied.

-21-

96.     Ardent also manipulates revenue codes to avoid other payment restrictions.  When multiple surgeries are performed at the same time on a patient, Medicare and Medicaid do not reimburse the full amount for all surgeries performed.  Instead, the usual process is to reimburse the full amount of the highest value surgery performed and some percentage amount of the other surgeries performed.  *See, e.g.*, Ctr. Medicare & Medicaid Servs., MLN Matters No. MM7587, *Payment for Multiple Surgeries in a Method II Critical Access Hospital (CAH)* (Apr. 1, 2012), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/MM7587.pdf.

97.     In a related vein, in some cases, where a more minor procedure is considered part of a more complicated procedure, government-funded healthcare programs will pay only for the more complex procedure.  Payment for the second, subcomponent procedure is bundled into the payment for the more complex procedure.

98.     To get around these reimbursement limitations, Ardent regularly changes the revenue code for the subcomponent surgery, thereby altering the claim form to make it appear that the surgeries did not occur at the same time and/or place.  For example, a 2016 Oklahoma Medicaid patient received femoral vascular stents (CPT 37227) and stents in the left external iliac artery (CPT 37221).  Both procedures were performed in an operating room.  For this and other specific exemplary claims, Relator is excluding all patient-identifying information in this complaint to protect patient privacy.  Relator has disclosed these details to the Government in a contemporaneously filed disclosure statement.  Those details are incorporated herein by reference.

99.     When Ardent originally submitted its claim to Medicaid, the correct revenue code, 360, was attached to both procedures.  Medicaid denied the claim for CPT 37227

procedure, because CPT 37221 is the higher-value surgery.  Ardent then re-ran the bill using a false revenue code, 490, for CPT 37227 (leaving CPT 37221 attached to revenue code 360).  By so doing, Ardent claimed that the patient received two operations in two completely different locations at the same time.  Because of this false statement, Medicaid paid for both procedures.

100.    Ardent does the same thing to double bill for the same CPT code.  Ardent will submit bills with the same CPT code, for example, 36569 (Insertion of Central Venous Access Device), as if it performed the surgery twice in two different sites of service, such as the emergency room (revenue code 450) and an operating room (revenue code 360).  Ardent thereby represents to the Government that a patient had the same high-value surgery performed twice on one day in two separate locations—and doubles its reimbursement for the same procedure.

101.    Ardent's scheme is not limited to situations where a claim will be denied if the true revenue code is used.  Ardent also falsifies revenue codes if the government will pay more for services performed in one location than if they were performed in a different location. On November 17, 2011, Ms. Buster emailed a group of Ardent employees, including Valerie Woodbury, the head of the Payment Variances Department, instructing them to bill wound-care services using revenue code 490 rather than a range of other revenue codes that accurately stated where these services were actually provided.  In this email, Ms. Buster acknowledged:  "Now I realize the 490 is ambulatory surgery and not necessarily the right revenue code," but nonetheless ordered that it be used because Ardent got paid more by falsifying the claims in that manner.

102.    Ardent similarly falsifies the site of service for treatment of burn victims, falsely claiming the services were provided in a treatment room (revenue code 761) instead of the operating room (revenue code 360).  On November 3, 2011, Ms. Elden emailed Ms. Buster

suggesting they "test" this manipulation. Ms. Buster responded that same day that the test had worked, allowing Ardent to get an increased payment.

103. In other situations, Ardent will *remove* revenue code 761 if doing so will (improperly) cause the government to pay Ardent more. For example, in 2013, a sterilization patient saw a doctor in a treatment room for an initial consultation before the procedure. That visit was initially billed—properly—with revenue code 761 (treatment room) and CPT code 99201 (new office visit). Medicaid denied the claim. Susan Bowling, a certified coder, forwarded the claim to Ms. Buster on June 12, 2013, asking, "Denise, What is the magic UB rev code for OK Medicaid for CPT 99201?" Ms. Buster replied on June 18, 2013: "The revenue code is correct the 99201 needs to be removed to get the flat fee." After Ms. Buster conferred with Ms. Taylor, her friend at OHCA who improperly provides billing information, Ms. Buster wrote on July 26, 2013: "[O]n this one family planning is only approved to pay the flat fee with revenue code 519 [clinic, other]. I updated this one online and it is now paid."

104. On information and belief, Ardent also, at times, manipulates the NPI number on claims to falsely represent that services were provided at HMC, a top-of-the-line teaching hospital, when the services actually occurred at other facilities including Hillcrest South, a facility that is qualified to provide a more limited range of services. Because certain procedures and levels of care are not available at Hillcrest South, Ardent falsely represents on the claims forms that the patients were treated at HMC.

### 3. Misrepresenting the Type of Services Provided and the Patient's Diagnosis

105. In addition to falsifying claims by misrepresenting where a service was performed, Ardent also routinely misrepresents the type of service performed and why the patient needed care. Typically this is done by changing the procedure code reported, but often

-24-

this also involves changing the reported site of service, and changing (or simply reordering) the diagnosis codes included on the claim.

106.    For example, Ardent "tested" changing revenue code 942 (which is specific to diabetes education) to 510 (the general clinic revenue code) for diabetes patients needing medical nutritional therapy.  Oklahoma Medicaid does not cover medical nutritional therapy, which is billed using CPT code 97802.

107.    Ms. Buster told Ms. Robinson on January 25, 2012, "Do me a favor and test this [claim billed using CPT coder 97802] with revenue code 510 instead of the 942 and let me know the results."  The test showed that this change would (fraudulently) cause Medicaid to pay the claim.  Ms. Buster then told Ms. Robinson, "Change it to 510 and remove the cpt code and submit proof of timely."

108.    Ardent also changes revenue code 412 (inhalation services) to 410 (general respiratory services) in the claim forms that it submits for reimbursement.  Revenue code 412 requires prior authorization; Medicaid will not reimburse inhalation services claims without such authorization.  Revenue code 410 does not.  In cases where Ardent fails to obtain this authorization, it falsely changes the revenue code 410 to evade this requirement.  Ardent "tested" this switch in or around November 2011 and has been making it ever since.

109.    Ardent changes revenue code 260 (general IV therapy) to 269 (other IV therapy) because revenue code 260 is tied to a low flat fee and 269 is not.  In a November 28, 2011 email, Ms. Buster wrote, "Claims billed with cpt code 96372, 96361 are being billed with revenue code 260 and only paying a flat fee and no additional units.  The reason this is happening is because the 260 revenue code in the Medicaid regs is attached to an IV administration fee that only pays one unit at a small flat rate."

a.    *Labor and Delivery Observation Services*

110.    One of Ardent's more significant fraudulent misrepresentation schemes relates to the billing for non-pregnancy-related services provided to pregnant patients.  Medicaid pays a fixed, flat fee for labor and delivery observation services (denoted with revenue codes 720 and 721), which is often higher than the fee-schedule rate Medicaid pays if the individual services are billed separately.

111.    However, this flat-fee payment for observation services is appropriate only if the patient is treated for "*[s]pecific pregnancy-related diagnoses*."  Okla. Admin. Code § 317:30-5-42.11 (emphasis added).  Claims for non-pregnancy-related services provided to patients who happen to be pregnant may not be billed in this manner.

112.    OHCA explicitly warned providers, including in a June 2013 bulletin, that revenue codes 720 and 721 may not be used just because a service occurs in the labor and delivery unit.  "[S]ince the use of those revenue codes generates a flat fee payment from Medicaid for labor and delivery observation, providers will need to find another appropriate revenue code to utilize."  Okla. Health Care Auth., OHCA PRN 2013-06, *SoonerCare Provider Reimbursement Notice: Outpatient Labor and Delivery Observation* (June 19, 2013), https://okhca.org/WorkArea/DownloadAsset.aspx?id=14935.  OHCA further emphasized that they "may recoup funds if an audit finds that [labor and delivery] observation was paid inappropriately."  *Id.*

113.    Even before this guidance, Ardent knew it was wrong to bill to revenue codes 720 and 721 for non-pregnancy-related medical concerns.  On January 13, 2012, Ms. Buster forwarded Ms. Robinson an email from OHCA that stated flat fees were only obtainable when pregnancy diagnoses are in the "primary [diagnosis] position."

-26-

114.     Rather than heed the warning, Ardent brazenly used this information as a roadmap for further fraud.  In exactly the way prohibited by the guidance, Ardent inappropriately reorders diagnosis codes so that the diagnosis codes triggering higher fixed-fee reimbursements are in the primary position, regardless of the real reason for a woman's hospital visit.

115.     Similarly, on instructions from Ms. Elden, Ardent employees are required to put "O26" (Other Pregnancy Related Symptoms, Unspecified) as the reason for a visit, again without regard for the actual reason.  Ardent does this even though its own Director of Shared Coding Services, Christy Matheson, warned the "Payments Variances" office in a March 15, 2012 email that "in some situations listing the OB diagnosis first is not in accordance with Coding Guidelines."

116.     Ms. Robinson reported Ardent's improper use of revenue codes 720 and 721 to misrepresent the type of services provided to FTI Consulting, the independent contractor who came to investigate Ardent's practices after Ms. Robinson reported them to CMS in February and March 2016 (as is discussed in greater detail below).  FTI Consulting told Ardent that its use of revenue codes 720 and 721 in these circumstances was improper.  Nonetheless, Ardent has continued with this improper scheme.  As a policy and practice, whenever a pregnant woman insured under Medicaid visits an Ardent facility, Ardent bills Medicaid for labor and delivery observation using revenue codes 720 and 721.

117.     In addition to the manipulations of diagnosis code order discussed above, Ardent sometimes removes CPT codes that reveal a patient was treated for medical issues unrelated to her pregnancy.

118.     For example, on March 6, 2012, Ms. Buster emailed Ms. Robinson, instructing her to "go ahead and remove the 99215 [99215 represents the highest level of care for

established patients being seen in an office] code per this email" after two different coders, Kim

Mook and Susan Bowling, informed Ms. Buster in the same email chain that "99215 is correct"

and that 99215 "is an outpatient facility level fee for antenatal services just like a visit to the

emergency room, and, if a CPT code is available that correctly describes the service provided we

are to apply that CPT code."

119.    At other times, Ardent misrepresents where the services to a pregnant woman

occurred, claiming the site of service was the emergency room rather than a clinic, to bypass

rules prohibiting payment for observation services in a clinic setting without a specific doctor's

orders.

b.    *Psychiatric Services*

120.    Another significant area of Ardent's fraud relates to its care for psychiatric

patients.  Ardent falsely bills psychiatric services as general medical services:  By so doing,

Ardent seeks to avoid the strict licensure and prior-authorization requirements that help protect

this vulnerable patient population.  Ardent instead misreports the types of services actually

provided.

121.    For example, HMC does not currently have a behavioral-health unit, nor has it

had one since around spring 2013.  Although HMC's website claims that they have a separate

unit for behavioral patients, they do not.  HMC no longer has a valid NPI number for behavioral

health (although, on information and belief, they may have an invalid one that they continue to

use sometimes).  Ardent hospitals, including HMC, instead treat psychiatric patients in acute-

care units and bill Medicare and Medicaid for such care.

122.    As Ms. Elden explained to Ms. Robinson in June 2016:  "The MHA unit [at

HMC] is an acute adult psych unit and billed under the acute HMC number with behavioral dx

and DRG [diagnosis-related group] codes. Per corp the MHA unit is not a distinct unit for either Medicare or Medicaid."

123.     Ardent typically gets paid more if it bills psychiatric care as if it were acute care, than if it were billed to a behavioral NPI. Acute care is reimbursed at the full DRG rate, whereas behavioral care is reimbursed at a per diem rate up to the DRG rate.

124.     For the same reasons, Ardent also sometimes changes the revenue code for psychiatric semi-private rooms (revenue code 124) to the code for general semi-private rooms (120) or semi-private rooms for medical, surgical, or gynecological patients (121). Ardent also sometimes changes the billing code for private room and board for psychiatric care (114) to the code for private room and board, general (110).

125.     Ardent knows that, in some cases, such obfuscation is "necessary" because certain government-funded healthcare programs will not pay for psychiatric care if the provider does not have a provider identification number that designates them as qualified for such. For example, in a May 19, 2016 email to Ms. Elden, Ms. Buster acknowledged that psychiatric claims have been "unbillable because we do not have a Medicaid adult psych number" and that Medicaid will not pay such claims "because they will not pay for mental health and substance abuse at HMC without a Medicaid number."

126.     Ms. Elden replied on May 24, 2016: "We have been updating the R&B UB Rev Code 124 and changing to 120 and we get paid DRG under acute number. We find that 124 UB Rev Code caused the issues."

127.     Ms. Elden emailed Ms. Robinson and Ms. Buster again a few days later on June 6, 2016, telling Ms. Robinson, "If you complete an IAB the 114 will become 110 to be more generic acute which is how the MH unit is defined through our provider number." "IAB" is one

-29-

of the terms Ardent uses to describe its rebilling process discussed herein, *i.e.*, the method by which they automatically resubmit claims once they determine that they can derive a higher rate of reimbursement from a changed code. Thus, Ms. Elden's email tells Ms. Robinson to change all revenue code 114 (psychiatric private rooms) accounts to 110 (private room, general) so that government payers will be unable to tell that the care provided was psychiatric, not acute.

128.     In a separate email dated June 17, 2016, Ms. Elden further explained, "Medicaid OK requires auth on the 114/124 psych services and since there [] isn't a specific provider number (distinct unit) for MHA for psych so auth can't be obtained." Therefore, "We were instructed by Caid & Corp some time ago to bill UB Rev Code general 110/120 instead of psych 114/124." Ms. Elden attached example bills "that paid" and ones that did not based on the admission diagnosis code. Ms. Elden advised, "It appears that if a patient has only a psych specific dx [diagnosis] or only psych type Medicaid coverage – claims are denying."

129.     In addition to changing revenue codes, Ardent also reorders diagnosis codes and other information related to patient care on its claim forms to hide that a patient's primary diagnosis is psychiatric, not medical.

### 4.     Falsely Reporting Services Provided to Adolescents and Children as if They Had Been Provided to Adults

130.     Perhaps even more troublingly, Ardent fails to follow the Oklahoma Medicaid rules for adolescent mental-health care. Oklahoma has specific rules about psychiatric care for persons under the age of 21. *See* Okla. Admin. Code § 317:30-5-95.24. These rules, which include specific staffing requirements, wellness checks, and other patient safety measures, help protect an extremely vulnerable population.

131.     Ardent, however, treats adolescent psychiatric patients in the adult-acute-care unit, which is not set up to meet these important requirements. For example, in late 2015, HMC

-30-

accepted a transfer from a different hospital of a patient under the age of 21 under an "Emergency Order of Detention—EOD." The transfer form listed the destination as "Hillcrest Behavioral"—a fictional unit. HMC accepted this patient but failed to get a prior authorization for his care, as is required for all inpatient adolescent psychiatric treatment. *See* Okla. Admin. Code § 317:30-5-95.24. To then induce Medicaid to pay for this adolescent's treatment, Ardent submitted bills to Medicaid without any CPT code, using the NPI for the acute-care unit.

132. Ardent is well aware of Oklahoma's requirements for adolescent mental-health treatment. In an April 2015 email, Ms. Elden informed Ms. Woodbury, Ms. Buster, and Ms. Robinson that the adolescent unit at HMC closed because Ardent found it "impossible to comply with the state documentation requirements for behavioral health adolescent."

133. In a similar vein, because Oklahoma Medicaid reimburses physical therapy ("PT"), occupational therapy ("OT"), and speech therapy ("ST") for adults on a flat-fee basis but pays for children's care on a fee-schedule, Ardent systematically removes CPT codes from children's therapies to improperly bill Medicaid for the adult rates.

### 5. Misrepresenting Other Material Information About the Nature of the Services Provided

134. Ardent further misrepresents the nature of the services provided by misusing coding modifiers, misusing generic codes, and falsely reporting patients' discharge status.

135. "Modifiers" are two digit suffixes that can be attached to CPT codes to indicate that, due to specific circumstances, traditional billing rules do not apply.

136. For example, typically a provider may not bill for both a surgical procedure and a standard office visit (known as an Evaluation and Management or E&M code) on the same day. However, if the E&M visit was necessary because of a medical condition wholly distinct from the surgical procedure, the provider may affix Modifier 25 to the claim, and government-funded

-31-

healthcare programs will pay for the E&M visit.  Medicare Claims Processing Manual, ch. 12, § 30.6.6(B).

137.     Similarly, Modifier 27 is appropriate when there are "multiple outpatient hospital evaluation and management encounters on the same date."  Ctr. Medicare & Medicaid Servs., Transmittal A-01-80, *Use of Modifier –25 and Modifier –27 in the Hospital Outpatient Prospective Payment System (OPPS)* (June 29, 2001), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/a0180.pdf.

138.     Certain types of care, such as wound care, may generally be billed only once per visit.  Providers may, in limited circumstances, append modifier 59 to bill the same procedure code multiple times in a day where the second treatment was for "different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same individual."  Modifier 59 Article, https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/downloads/modifier59.pdf.

139.     Routinely, Ardent improperly uses modifiers to submit falsely inflated claims to government-funded healthcare programs.

140.     For example, Ms. Buster directed Ms. Robinson to apply modifier 59 on all wound care patients, regardless of the actual number of incision sites or other justification in the medical record.  This practice is known to Ardent employees as "doubling the line."

141.     Ardent also systematically adds modifiers 25 and 27 to claims without reviewing patient records to determine if these modifiers are appropriate.  Thus, for example, instead of properly billing government payers for a single emergency room visit, with multiple CPT codes and modifiers, Ardent bills for multiple separate emergency room visits.

-32-

142.    Contrary to established rules, Ardent also bills for drugs or services using generic codes, rather than the proper, more specific code.

143.    For example, the National Drug Code ("NDC") is a unique product identifier for human drugs in the United States.  It is used by Medicare and other programs to identify the medications provided to patients and to determine the proper payment rate.

144.    If a drug has an NDC identifier, that number must be used when submitting claims for reimbursement.  Generic codes may only be used for drugs that do not have any NDC identifiers assigned to them.  *See* Novitas Solutions, FAQ Billing-Medications (last updated Oct. 25, 2016) ("Only use NOC codes if there is not a HCPCS Level II or current procedure terminology (CPT) code available that describes the service."), http://www.novitas-solutions.com/webcenter/portal/MedicareJH/page/pagebyid?contentId=00004990&_adf.ctrl-state=1bhaf6lejx_4&_afrLoop=256770954226971#!.  Ardent, however, systematically misuses generic codes if, by doing so, they can get higher reimbursement from government-funded healthcare programs.

145.    For instance, Ardent systematically misuses "J9999," the generic code for chemotherapy drugs not otherwise classified.  In October 2013, in an effort to "recoup some old claim costs" that were unpaid, Erinn Oller, the Director of Operations for HMC, suggested that "specific meds . . . need to be billed a certain way by a generic jcode vs the c or q code in which the drug is assigned."

146.    Vickie Nelson, a coder, responded:  "It is not appropriate to bill with J9999, because that is 'not otherwise classified, antineoplastic'.  Not other classified HCPCS should only be used if a more specific HCPCS is unavailable."

147.     Ardent ignored Ms. Nelson's warning.  Instead, in an email response that added

Steve Winegeart, the CFO of HMC at the time as a recipient, Ms. Elden wrote on October 23,

2013, that she was ready to "program" a change to J9999 "in either Star or SSI.  We need buy in

from team but once I understand it, I will complete change control and send out for approval."

On October 31, 2013, a specific list of accounts were forwarded to Ms. Elden that were

identified as ones that "need to be billed for the j9999."  Ms. Elden, in turn, forwarded the list to

Ms. Buster asking her to "work these paid ones from an Underpayment?"

148.     Ardent engages in similar fraud with claims for dental services.  Medicaid will not

pay for many dental services if billed as such.  To evade this limitation, Ardent routinely codes

such services using code D9999 ("Unspecified Adjunctive Procedure By Report").

149.     Ardent also falsifies patient discharge status information to fraudulently increase

reimbursement.  Every claim submitted to Government payers includes a "Discharge Status

Code," indicated in Box 17 on the UB-04 claim form (e.g., "01" means discharge to home, "06"

means discharge to home-health services, "70" means discharge to hospital units not otherwise

specified).

150.     Medicare pays hospitals different rates for an inpatient hospital stay depending on

the discharge code.

151.     "Medicare makes full MS-DRG payments to Inpatient Prospective Payment

system (IPPS) hospitals when the patient is discharged to their home."  Ctrs. Medicare &

Medicaid Servs., MLN Matters No. SE1411 Reissued, *Clarification of Patient Discharge Status*

*Codes and Hospital Transfer Policies* (Nov. 17, 2015), https://www.cms.gov/Outreach-and-

Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1411.pdf.

152.     If, on the other hand, a patient is transferred to another facility or to receive home health services, the "transferring hospital is paid a per diem payment up to and including the full DRG payment which include a cost outlier payment if applicable." *Id.* The per diem rate is either equal to or less than the full DRG rate payment.

153.     Medicare considers miscoded discharge codes to be "a claim billing error." Ctrs. Medicare & Medicaid Servs., MLN Matters No. SE0801 Rev., *Clarification of Patient Discharge Status Codes and Hospital Transfer Policies* (Nov. 17, 2015), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/ MLNMattersArticles/downloads/SE0801.pdf.

154.     Contrary to these rules, Ardent misrepresents discharge codes on its claims to receive the full DRG rate payment when the per diem rate payment would be lower.

155.     Ardent also routinely overstates the intensity of emergency room E&M services, thereby inducing the Government to pay a falsely inflated reimbursement rate.

156.     Ardent bills twice for the same procedure, including procedures that can only happen once. For example, Ardent bills CPT Code 42830 (Primary Adenoidectomy) for two separate surgeries. If a secondary adenoidectomy is required at a later date, the second surgery should be billed to CPT Code 48235. Ardent, however, bills the second surgery to CPT 42830, the higher reimbursement code.

157.     Ardent misstates provider NPI numbers when a patient's care will not be covered by a particular provider's NPI for whatever reason.

158.     Ardent also falsifies whatever information is necessary so that services can be billed consistent with whatever prior authorization Ardent received from the government-funded healthcare program. Thus, for example, Ardent will bill services as outpatient when they were

-35-

actually inpatient services if Ardent failed to obtain the proper authorization for inpatient care—or vice versa.

### B. Ardent Fails to Investigate or Repay Suspected Overpayments from Government-Funded Healthcare Programs

159. Ardent's reimbursement modeling system not only identifies situations where Ardent was paid less than it expected for the service in question, but also situations where the government paid Ardent more than Ardent expected.

160. As described above, if the Government reimburses Defendants *less* than Ardent's contracting models expected for a particular claim, Ardent games the system to identify ways to change codes to get paid more.

161. Ardent similarly manipulates the information in its claims systems to avoid repaying government-funded heathcare programs when it learns, or is on notice of the probability, that it has been overpaid by the Government.

162. Instead of returning the overpayment as required, 42 U.S.C. § 1320a-7k (d)(3), Ardent determines why the overpayment occurred and then manipulates its codes to (1) ensure future claims will also receive the higher reimbursement rate and (2) falsely claim that the full overpaid amount was "justified."

163. Ardent then closes the account as a "false variance" or "reversal," thereby falsifying its books to hide the overpayment. In other circumstances, when the above-described process is too burdensome, Ardent simply closes out the reported overpayment identified in its systems, and refuses to take further action.

164. In sum, whether the discrepancy is an "overpayment" or "underpayment," Ardent uses all payment variances as a roadmap to fraud.

-36-

165.     For the majority of the time Ms. Robinson has worked at Ardent, Defendants did not have dedicated employees responsible for identifying, investigating, and repaying overpayments.  Instead, Ardent would occasionally task the underpayment specialists, such as Ms. Robinson, with that job.

166.     Ardent gave these employees little training in how to properly handle overpayments, and routinely pulled them off the task (the few times it was actually scheduled) to handle underpayments and other work.

167.     And even this minimal focus was stopped in 2014 with the promotion of Sarah Morrison, whose job description included addressing both Medicare underpayments and overpayments. However, Ms. Morrison did not return overpayments.  Ms. Morrison was not familiar with Novitas's DDE system and Ardent failed to train her on how to use it.  She did not even know, as a practical matter, how to return overpayments.

168.     Instead, Ms. Robinson was asked in the fall of 2015 to review the overpayment accounts that Ms. Morrison had been supposed to review.  Ardent never gave Ms. Robinson the time or the resources to actually review these accounts within the 60-day return window mandated by Medicare.

169.     Ms. Robinson grew increasingly concerned that Ardent was not properly investigating and repaying these identified and suspected overpayments.  After her repeated complaints within Ardent were ignored, on February 29, 2016, Ms. Robinson reported her concerns regarding Ardent's improper retention of overpayments to the Office of Inspector General ("OIG") Hotline.

170.     At that time, Ardent's systems showed that there were at least $10 million in pending overpayments for claims from 2009 to 2013 that had not been repaid.

171.    Shortly thereafter (on March 30 and 31, 2016), FTI Consulting came into Ardent's offices for a two-day audit.  Ms. Robinson reported her concerns about Ardent's billing practices, and lack of an effective process to return overpayments, to FTI.

172.    Around the time of FTI Consulting's visit, Ms. Buster began a systematic process to hide Ardent's failure to return overpayments.  Beginning on or around March 30, 2016—the same day as FTI Consulting's audit—Ms. Buster began closing overpaid accounts in batches without reviewing them.  Ms. Buster directed Ms. Robinson to do the same.  Ms. Buster marked these batch-closed accounts as "Closed – False Variance" or "Closed – Refund Rejected."

173.    On information and belief, Ms. Buster never reviewed these accounts and therefore had no basis to mark them as "False Variance."  On information and belief, Ms. Buster never submitted these accounts to CMS and therefore had no basis to mark them as "Refund Rejected."  For example, Ms. Buster batch-closed all New Mexico Medicaid overpayment claims without reviewing them to see if they were real overpayments.

174.    On March 30, 2016, Ms. Buster asked Ms. Robinson via email to "leave the labor and observation accounts in self reported govt overpayments and reason status- manual generation of overpayments."  In other words, Ms. Buster asked Ms. Robinson to not report the overpayments received by Ardent for its upcoded labor and delivery observation claims.  In reply, Ms. Robinson informed Ms. Buster that she had "reported to FTI Consulting group I believe these are real overpayments but asked to close as F/V Modeling [False Variance Modeling]."

175.    Ms. Robinson refused to batch-close overpayments because she insisted on reviewing each of them to determine if they were true overpayments.  As a result, Ms. Buster simply batch- closed the accounts herself.

176.    On May 18, 2016, Ms. Buster emailed a list of accounts to Ms. Robinson that she claimed "will no longer be listed as an overpayment and can be closed as false variance modeling" after a "reprice" in Ardent's internal billing system, MedAssets, occurred.  Ms. Buster provided no further information regarding this "reprice" or the justification for it.

177.    A reprice often is the process described above by which Ardent would "program" its system to miscode bills thereby raising reimbursement rates.  (Ardent also calls this an IAB.) In other words, when the government overpays for Ardent's services, Ardent simply changes its system to bring its stated expected reimbursement up to the level that the government paid. Ardent accomplishes this by miscoding, dropping codes, adding codes, or misstating the place of service—all of the fraudulent manipulations used to upcode claims identified as having been "underpaid," as discussed above.

178.    In addition, sometimes Ms. Buster manually resets the expected reimbursement— *i.e.*, reprices the service—to hide true overpayments.  For example, after Ardent improperly billed Medicaid for newborn circumcisions as a separate surgery procedure (the actual procedure is lumped into the newborn DRG payment and should not be billed separately), Ardent received an overpayment from Medicaid.  Once Ms. Buster determined why that particular claim was overpaid, Ms. Buster changed the system's expected payment amount for all newborn claims with circumcisions to fraudulently transform the overpaid amount into the expected amount.

179.    At times, Ardent also simply marks accounts as paid, falsely representing (within its own systems) that funds have been returned to the Government that have not, in fact, been returned.  For example, Ardent billed Medicaid as a patient's primary insurer on November 8, 2016.  Medicaid paid $12,616.95.  Ardent's internal Star system has a note, dated January 4, 2017, that this payment was in error as the patient had private insurance, which should have been

Case 3:17-cv-00243   Document 1   Filed 02/01/17   Page 40 of 52 PageID #: 40

billed as the primary insurer. The note stated that the "refund packet" had been submitted. Ms. Robinson has confirmed that as of January 5, 2017, this refund was not sent. Ardent's falsified internal notes are intended to conceal its fraud.

180.     In addition to its generally lax investigation of overpayments, contrary to CMS rules, Ardent categorically refuses to investigate any overpayments of $25 or less.

181.     Federal rules requiring the repayment of overpayments do not exempt small-dollar claims. *See* Medicare Program; Reporting and Returning of Overpayments, 81 Fed. Reg. 7654, 7677 (Feb. 12, 2016). Nonetheless, Ardent chooses to ignore any overpayment under 25 dollars.

182.     On April 29, 2016, Ms. Buster emailed Ms. Ghant, Ms. Glover, Ms. Morrison, and Ms. Robinson to inform them that "we have to lower our threshold on the Medicare overpayments to $1 instead of $25." Ms. Buster was correct that Ardent needed to lower its minimum threshold, but incorrect that *any* minimal threshold was acceptable. However, even this small step towards compliance was quickly reversed. Two hours after Ms. Buster's original email, she emailed the group, "Change in plans I was asked to change it back to $25 will let you know more as I find out more."

183.     In addition, on information and belief, Ardent fails to accurately report retained overpayments on required Medicare reports, including the quarterly Medicare Credit Balance Report (CMS-838).

184.     In all of these ways, Ardent has intentionally or recklessly failed to take the necessary steps to review identified overpayments and to return the government's money in a timely fashion. Instead, Ardent has intentionally or recklessly attempted to cover its tracks by

batch-closing accounts with notes that the accounts reflect a false variance or that the government rejected the refund.

### C. Ardent's Submission of False Claims for Sterilization Procedures Performed Without Proper, Informed Consent of the Patients

185.     For all elective sterilizations, federal Medicaid regulations require that a competent adult patient sign a consent form at least 30 days and no more than 180 days before the procedure.  42 C.F.R. § 441.253.  The only limited exceptions are in cases of "premature delivery or emergency abdominal surgery," when a consent form signed 72 hours in advance is acceptable.  *Id.*  Under no circumstances will Medicaid pay for sterilizations that are performed without a signed and completed consent form.

186.     This clear directive ensures all federally funded sterilizations are performed on patients who give their informed consent.  Such a requirement stems from an unfortunate U.S. history of involuntary sterilizations.  *See, e.g.*, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); *Relf v. Weinberger*, 565 F.2d 722, 724 (D.C. Cir. 1977).  The consent form itself outlines its purpose:  "The purpose of requesting this information is to ensure that individuals requesting sterilization receive information regarding the risks, benefits and consequences, and to assure the voluntary and informed consent of all persons undergoing sterilization procedures in federally assisted public health programs."  The form also states, "Although not required, respondents are requested to supply information on their race and ethnicity.  **Failure to provide the other information requested on this consent form, and to sign this consent form, may result in an inability to receive sterilization procedures funded through federally assisted public health programs**."  (Emphasis added.)

187.     Despite the constitutional concerns raised by involuntary and unconsented-to sterilizations, Ardent regularly fails to obtain complete and effective patient consent before

-41-

performing sterilization procedures.  When this happens, Ardent doctors the necessary paperwork (by forging signatures, backdating forms, etc.) and uses the forged form to get the Government to pay the claim.

188.    In March 2014, for example, by Ardent's own accounting, there were 17 Oklahoma Medicaid sterilization patients with unsigned forms, for a total expected Medicaid reimbursement of $370,923.14.  Ms. Elden forwarded this information to other Ardent executives on March 25, 2014, including Steve Winegeart (then-CFO for HMC), James Washecka (then-CFO for Hillcrest Hospital South, now CFO of the Lovelace Health System, Ardent's New Mexico branch), Brandon Bullard (CFO of Bailey Medical Center and Claremore Hospital), Annette Saiz (Assistant Vice President, Revenue Cycle Operations), and Eleanor Madrid (Central Business Office).

189.    Ms. Elden further noted, "I need you to point me in the right direction to get the Medicaid OK sterilization completed prior to billing.  We have so many claims not being able to be billed due to consents not being in the record so we started this log and **hold the claims chasing down the consent**.  Pt Access & HIM is working to obtain but maybe we need to get the OR Directors or even the OB offices involved."  (Emphasis added.)

> **D.    Ardent's Scheme to Falsely Claim Disproportionate Share Hospital Payments**

190.    Defendants compound these frauds by submitting false claims through programs designed to compensate Disproportionate Share Hospitals ("DSH") for charity care and bad debt.

191.    A number of Defendants' hospitals, including its flagship HMC, are Disproportionate Share Hospitals ("DSHs"), generally meaning they serve a poor population with high Medicare and Medicaid enrollment rates.  *See* 42 C.F.R. § 412.106.  DSHs are entitled to additional payments, including reimbursements for a percentage of "uncompensated care."  42

U.S.C. § 1395ww(r)(2)(C). Uncompensated care is "care provided to individuals for which no payment is received." American Hospital Association, *Uncompensated Hospital Care Cost Fact Sheet* (December 2010), http://www.aha.org/content/00-10/10uncompensatedcare.pdf. This sum comprises both "charity care" provided (care for which a hospital does not expect reimbursement) and "bad debt" incurred (bills for which a hospital cannot obtain reimbursement). *Id.* Uncompensated care calculations specifically exclude "other unfunded costs of care, such as underpayment from Medicaid and Medicare." *Id.*

192.     Ardent uses these programs to write off their overinflated cost of service based on their miscoded expected reimbursements. Defendants also use these strategies to falsely recoup costs from Government payers when their claims are denied due to Ardent's failure to meet program specifications, such as failing to obtain required prior authorizations or patient signatures.

193.     On information and belief, the process works in the following manner: (1) Ardent first submits unpayable claims to government payers, such as sterilizations without signed consents; (2) when those claims are rejected for the lack of a proper consent form, prior authorization, or other reasons, Ardent writes off the "loss" as an "ATS" or "Adjustment/Transfer Sheet"; (3) Ardent submits the "costs" of these falsified losses as uncompensated care costs to the Government; and (4) Ardent then falsifies patient records by fraudulently signing consent forms or changing codes and resubmits the claim to Medicaid or Medicare and receive payment based on the false statement. Effectively, then, Ardent is paid twice for faulty claims.

194.     For example, on September 20, 2011, Ms. Buster emailed Ms. Robinson that a claim failed to hit the desired labor and delivery observation flat fee and that the claim "will need

-43-

an ATS completed to adjust the c/a to $112.92 instead of $642.40.  Will not be paid on this

because the diagnosis code is not an observation covered diagnosis code.  DANG IT!!!  I am not

happy about this either.  Just for grins after the ATS is posted I am going to drop an IAB

anyway."  As discussed above, "IAB" is the term Ardent uses to describe its automatic rebilling

or testing process.

195.    As another example, a 2016 patient had rejected medication claims.  Ardent's

internal billing notes system, Star, has the following note for this claim: "resubmitted the J9355

with NDC code and now paying additional $3766.14 the J2505 will not be paid **no auth was

secured but was required need to do an ATS to write off that amount for $3838.10**."

(Emphasis added.)  Because Ardent failed to obtain a prior authorization for a medication, it

wrote off a $3838.10 loss as uncompensated care, and then rebilled Medicare.

## Count I
## False Claims Act
## 31 U.S.C. §§ 3729(a)(1)(A)-(B) and (G)

196.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 195 above as though fully set forth herein.

197.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

198.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

199.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

200.    By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

201.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

202.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

203.    Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

-45-

## Count II
## New Mexico Fraud Against Taxpayers Act
## N.M. Stat. Ann. § 44-9-1 *et seq.*

204.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 203 above as though fully set forth herein.

205.     This is a claim for treble damages and penalties under the New Mexico False Claims Act.

206.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to an employee, officer, or agent of the New Mexico State Government for payment or approval.

207.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to obtain or support the approval of, or the payment on, the false or fraudulent claims from the New Mexico State Government.

208.     By virtue of the acts described above, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the New Mexico State Government.

209.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

210.     By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

211.     Additionally, the New Mexico State Government is entitled the maximum civil penalty of $10,000 for each and every violation alleged herein.

### Count III
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-1 *et seq.*

212.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 211 above as though fully set forth herein.

213.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

214.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment under the Medicaid program to the New Mexico State Government for payment or approval.

215.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims under the Medicaid program.

216.     By virtue of the acts described above, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the New Mexico State Government, relative to the Medicaid program.

217.     The New Mexico State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

218.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### Count IV
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, § 5053.1 *et seq.*

219.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 218 above as though fully set forth herein.

220.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

221.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

222.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

223.    By virtue of the acts described above, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Oklahoma State Government.

224.    The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

225.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

226.    Additionally, the Oklahoma State Government is entitled the maximum civil penalty of $11,000 for each and every violation alleged herein.

## PRAYER

WHEREFORE, Ms. Robinson prays for judgment against the Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*, N.M. Stat. Ann. § 27-14-1 *et seq.*, N.M. Stat. Ann. § 44-9-1 *et seq.*, and Okla. Stat. tit. 63, § 5053.1 *et seq.*;

2.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $21,563 for each violation of 31 U.S.C. § 3729;

3.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of N.M. Stat. Ann. § 44-9-1 *et seq.*;

4.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Okla. Stat. tit. 63, § 5053.1 *et seq.*;

5.      That Plaintiff-Relator Robinson be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the comparable provisions of the New Mexico and Oklahoma False Claims Acts;

6.      That Plaintiff-Relator Robinson be awarded all costs of this action, including attorneys' fees and expenses; and

7.      That Plaintiff-Relator Robinson recover other such relief as the Court deems just and proper.

-50-

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Robinson hereby demands a trial by jury.

February 1, 2017

Respectfully Submitted,

BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Jerry E. Martin (TNBPR # 20193)
Seth Hyatt (TNBPR # 31171)
Bank of America Plaza,
414 Union St., Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

CONSTANTINE CANNON LLP
Timothy McCormack
Sarah P. Alexander
1001 Pennsylvania Ave., N.W.,
Suite 1300 N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501
tmccormack@constantinecannon.com
spalexander@constantinecannon.com

-51-